**EXHIBIT A**

Case 1:25-cv-08593    Document 1-1    Filed 10/17/25    Page 2 of 22

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
----------------------------------------------------------------X
TRIBECA SPACE MANAGERS, INC.,

|  |  |
|---|---|
| **Plaintiff,** | **Index No. 653292/2013** |
| -against- | <u>**AMENDED COMPLAINT**</u> |

TRIBECA MEWS LTD., BRAD THURMAN as
EXECUTOR OF THE ESTATE OF HAROLD
THURMAN, BRAD THURMAN, and 25
MYRENTCO, LLC,

**Defendants.**
----------------------------------------------------------------X

Plaintiff, Tribeca Space Managers, Inc. ("Plaintiff"), by its attorneys, Rivkin Radler LLP, as and for its amended complaint against defendants, Tribeca Mews Ltd. (the "Sponsor"), Brad Thurman as Executor of The Estate of Harold Thurman ("Harold"), Brad Thurman ("Brad") and 25 MyRentco, LLC ("Myrentco"), respectfully alleges as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      This action arises from Sponsor's breaches of contract in connection with the offering and sale of units at The Tribeca Space Condominium (the "Condominium"), located at 25 Murray Street, New York, New York (the "Building"). Although it has been almost ten (10) years since the first closing of a residential unit, defendant Sponsor and its principals, Brad and Harold, have continued to breach their obligations and duties under the condominium offering plan (the "Plan"), by, among other things: (a) failing to obtain a permanent certificate of occupancy ("PCO") for the Building which, by express provision of the Plan, Sponsor was obligated to procure on or before July 1, 2010; (b) permitting the temporary certificate of occupancy ("TCO") for the Building to lapse on numerous occasions; and (c) failing to construct the Building in compliance with all applicable codes, filed plans and specifications and the Plan.

## PARTIES

2.      At all times relevant hereto, Plaintiff, Tribeca Space Managers, Inc. (the "Plaintiff" or the "Board"), was and still is the New York State incorporated association of the owners of units in the Building, which was converted into a condominium pursuant to a declaration of condominium filed and recorded pursuant to Article 9B of the Real Property Law of the State of New York in the office of the New York County Register.

3.      Upon information and belief, at all times relevant hereto, Sponsor was, and still is, a New York limited liability company with a place of business at either or both 2700 Grand Avenue, Bellmore, New York 11710 and 49 West 32nd Street, Second Floor, New York, New York 10001 and the Sponsor of the of the condominium offering of units for sale in the Building pursuant to the Plan.

4.      Upon information and belief, at all times relevant hereto, Harold was an individual residing in the State of New York and, upon further information and belief, was a principal of the Sponsor who, pursuant to the regulations promulgated by the New York State Department of Law, Office of the Attorney General (the "Regulations"), was required to, and did, sign a certification of the Sponsor and principal in which he warranted that he personally assumed responsibility for Sponsor's obligations under the Plan.

5.       Upon information and belief, at all times relevant hereto, Brad was, and still is, an individual residing in the State of New York and, upon further information and belief, was, and still is, a principal of the Sponsor who: (i) pursuant to the Regulations, was required to, and did, sign a certification of the Sponsor and principal in which he warranted that he personally assumed responsibility for Sponsor's obligations under the Plan; (ii) served on the Board from 2008 until

Case 1:25-cv-08593    Document 1-1    Filed 10/17/25    Page 4 of 22

September, 2012.

6.      Harold, the father of Brad, has previously been found liable for engaging in a fraudulent and deceptive scheme that victimized members of the public.  In <u>People v. Apple Health & Sports Clubs, Inc., Thurcon Props. & Harold Thurman</u>, 80 N.Y.2d 803, 807 (1992), the New York Court of Appeals affirmed a lower court finding that Harold had unlawfully operated four health clubs, and there was "abundant evidence that Apple Health was guilty of fraud and persistent illegality in the way it conducted business," and that Harold had actual knowledge of, and participated in, Apple Health's fraudulent and illegal business dealings.

7.      Further, Harold, Brad and the Sponsor were previously the subject of an action brought by purchasers of units in the Building to compel Sponsor to convey the units to the purchasers in the action; in that action, Harold, Brad and the Sponsor were charged with having purposely delayed closings for periods long after the Plan represented that Sponsor would commence closing in the hope that purchasers would rescind their contracts and Sponsor could then resell the units at the then substantially higher market prices.

8.      Upon information and belief, at all times relevant hereto, Myrentco was, and still is, a limited liability company organized and existing under the laws of the State of New York.

## THE FACTS

9.      Sponsor reconstructed the Building, much of which was originally erected in the nineteenth century, in order to create a single, 87-unit, mixed use building consisting of 10 stories and containing 74 residential units, 17 commercial units, 1 superintendent's unit, a cellar and a sub-cellar.

10.      Pursuant to the Plan, which was accepted for filing on or about March 20, 2006, Sponsor began selling condominium units (the "Units") to the public.

11.     The first closing (the "First Closing") for a residential unit took place on or about July 1, 2008 and residents began to move into the Building shortly thereafter.

12.     The Board was controlled by Sponsor until mid-2009.

13.     Brad served on the Board from 2008 until September, 2012.

## A. OBLIGATIONS UNDER THE OFFERING PLAN

14.     As set forth in more detail in paragraphs 18-20, 45, 47 and 49-50 below, the Plan sets forth a series of specific obligations of the Sponsor.

15.     Most importantly, as it pertains to this action:

(a) Page 8 of the Plan provides, in pertinent part, that:

"The Sponsor's obligation regardless of any limitations contained in the Plan cannot go below the duty to construct the Premises in accordance with all applicable codes and filed plans and specifications.";

(b) Plan, at page 47, states, in pertinent part, that:

"The issuance of a final Certificate of Occupancy for the Building shall be deemed presumptive evidence that the Building, its appurtenances and all the Units have been substantially completed in accordance with the Plan and the "plans." However, nothing herein contained shall excuse Sponsor from any of its obligations under this Plan or in law"; and

(c) Page 52 of the Plan provides, in pertinent part that:

"The Sponsor is obligated to obtain a permanent Certificate of Occupancy. The Sponsor's obligation, regardless of any limitations in the warranty, cannot go below the duty to construct the Premises in accordance with all applicable codes and filed plans and specifications. Any conflict between the disclaimers and the Sponsor's obligation to construct the Premises in accordance with all applicable codes and filed plans and specifications shall be resolved in favor of the latter."

16.     On June 3, 2005, Brad and Harold each signed a Certification of Sponsor and Sponsor's Principals (the "Certification").

17.     Upon information and belief, the Building was approximately 95% constructed at

the time that Brad and Harold executed the Certification.

## B. SPONSOR'S FAILURE TO OBTAIN A PCO

18.     Page 48 of the Plan provides, in pertinent part that:

"If by the date of the first closing only a temporary Certificate of Occupancy for the Building shall have been issued, Sponsor will use its best efforts to cause the Building Department to continuously renew the temporary Certificate of Occupancy until final Certificate of Occupancy covering all Units offered under this Plan shall have been issued.  Sponsor is obligated to obtain the final Certificate of Occupancy, and will do so prior to the expiration of any temporary Certificate of Occupancy. Sponsor will, at its sole cost and expense, cause to be performed all work and will cause to be supplied all materials necessary to renew the temporary Certificate of Occupancy and Certificate of Compliance for electrical work, boiler inspection and elevator inspection…Prospective purchasers are advised that a permanent Certificate of Occupancy is required for permanent residential use of the Building and that a temporary Certificate of Occupancy may be used only for a total of two (2) years from the date of its issuance.  If the temporary Certificate of Occupancy shall have expired prior to issuance of a permanent Certificate of Occupancy, residential occupancy of the Premises will be a violation of the Multiple Dwelling Law, subjecting the occupants to penalties under the Multiple Dwelling Law including the imposition of fines.  Additionally Unit Owners may not be able to sell or refinance their Units."

19.     Page 49 of the Plan provides, in pertinent part that:

"Prospective purchasers are advised that a permanent Certificate of Occupancy if required for permanent residential use of the Building and that a temporary Certificate of Occupancy may be used only for a total of two (2) years from the date of its issuance."

20.     Page 52 of the Plan provides, in pertinent part:

"In the event a permanent Certificate of Occupancy for the Building has not been obtained at or prior to the first closing, Sponsor will place in a special escrow account with its counsel, Charles W. Weiss, the amount certified by Sponsor's architect as reasonably necessary to complete the work needed to obtain a permanent Certificate of Occupancy."

21.     By the time of the First Closing, only a TCO for the Building had been issued by the New York City Department of Buildings (the "DOB").

22.     Sponsor failed to obtain a PCO for the Building on or before July 1, 2010, which is

Case 1:25-cv-08593    Document 1-1    Filed 10/17/25    Page 7 of 22

the date that is two (2) years after the first residential closing, as required by the terms of the Plan.

23.       The Unit Owners and residents complained to the Sponsor and Thurcon about the Sponsor's failure to timely obtain a PCO in accordance with the terms of the Plan.

24.       To date, almost ten (10) years since the first residential closing, Sponsor has still not obtained a PCO for the Building.

25.       Sponsor not only failed to obtain a PCO, but intentionally and knowingly failed to fund an escrow with funds "necessary to complete the work needed to obtain a permanent Certificate of Occupancy" as required under the Plan.

26.       Sponsor did not continuously renew the TCO, having permitted the TCO to lapse approximately twenty-four (24) times since the issuance of the first TCO.

27.       Sponsor has been using a TCO for approximately ten (10) years notwithstanding that the Plan provides that Sponsor may not use a TCO for longer than two (2) years from the date of its issuance.

C. **SPONSOR'S FRAUDULENT TRANSFER OF UNITS TO MYRENTCO**

28.       By July, 2011, Sponsor had sold all but ten (10) Units offered for sale under the Plan; namely units 2B, 2H, 3K, 4J, 5A, 7A, 7H, PH10A, PH10E and PH10F (the "Unsold Units").

29.       On or about July 20, 2011, Sponsor transferred seven (7) of the Unsold Units (the "Myrentco Units") to Myrentco, an entity that was organized and created by Sponsor, and owned by Sponsor's Principals, for no consideration.

30.       Upon information and belief, Brad and Harold directed the transfer of the Myrentco Units to Myrentco for no consideration.

31.       Sponsor and Myrentco share common ownership, operate from the same corporate offices and act as one singular, united family enterprise.

32.    The transfer of the Myrentco Units to Myrentco was a mere change in identity or form of ownership of the Myrentco Units, and did not change the beneficial ownership of the Myrentco Units.

33.    Sponsor and Myrentco have admitted that the transfer of the Myrentco Units was a "related party transaction."

34.    Upon information and belief, Myrentco was formed by Sponsor and Sponsor's Principals for the purpose of shielding Sponsor's assets and to insulate the Sponsor for liability to Plaintiff resulting from Sponsor's failure to deliver the Building in accordance with its obligations under the Plan.

35.    Sponsor has not owned a unit in its own name since sometime in 2012 while Myrentco continues to own six (6) units.

## D. BRAD, HAROLD AND SPONSOR'S FRAUDULENT
## TRANSFER OF PROCEEDS FROM THE SALE OF UNITS

36.    Upon information and belief, Sponsor transferred the proceeds, or a portion of the proceeds, from the sale of Units (the "Proceeds") to Brad and/or Harold.

37.    Upon information and belief, Sponsor transferred the Proceeds to entities owned and/or controlled by Brad and/or Harold.

38.    Upon information and belief, Sponsor transferred the Proceeds to family members of Brad and/or Harold.

39.    Upon information and belief, the transfer of Proceeds and Myrentco Units described herein were effectuated for the purpose of shielding Sponsor's assets and to insulate the Sponsor for liability to Plaintiff resulting from Sponsor's failure to deliver the Building in accordance with its obligations under the Plan.

40.    Upon information and belief, Brad participated in the transfer of the Proceeds and

the Myrentco Units described herein.

41.    Upon information and belief, Harold participated in the transfer of the Proceeds and the Myrentco Units described herein.

42.    Upon information and belief, Brad was a beneficiary of the transfer of the Proceeds and the Myrentco Units described herein.

43.    Upon information and belief, Harold was a beneficiary of the transfer of the Proceeds and the Myrentco Units described herein.

## E. SPONSOR'S FAILURE TO CONSTRUCT THE BUILDING IN COMPLIANCE WITH THE PLAN, APPLICABLE CODES, FILED PLANS AND SPECIFICATIONS

44.    Plaintiff retained Thornton Tomasetti (the "Engineer"), a leading forensic expert in the engineering, design and construction of buildings of this type to perform a high level assessment (the "Assessment") of the Building.

45.    It was determined that, in breach of the Plan, Defendants failed to construct the Building in compliance with the Plan, applicable codes and the filed plans and specifications in the following ways, among others:

> (a) Page 92 of the Plan required that the Building be: "handicapped accessible and handicapped adaptable. However, in breach of the Plan, certain hallways on floors 2 through 10 of the Building are neither handicapped accessible nor handicapped adaptable;
>
> (b) Page 95 of the Plan provides, in pertinent part that: "The floors from the 6th floor to Roof are non-combustible framing of steel columns and girders with steel joists covered with a cementations [sic] floor and gypsum wallboard ceilings. The roof construction is also the same non-combustible construction as the 6th trough [sic] 10th floors." However, in breach of the Plan, the floor on the sixth floor of the Building was not constructed with cementitious, non-combustible materials and the floors on floors 7 through 10 of the Building were not constructed with non-combustible materials;
>
> (c) Page 95 of the Plan provides, in pertinent part that: "Existing exterior walls are of brick masonry and "brownstone". The exterior walls from the 6th floor to the roof are of non-bearing non-combustible construction of steel studs, cementitious

board, gypsum wallboard Styrofoam with two (2) layers 1/8" each of cement with insulation within the stud cavities as  required giving a minimum U factor as per the New York State Energy Conservation Code."  However, in breach of the Plan, the exterior walls of floors 1 through 5 of the Building are not brick, masonry or brownstone and the exterior walls of floors 6 through 10 of the Building are not non-combustible and  do not contain gypsum wallboard Styrofoam with two layers 1/8" cement each;

(d) Page 95 of the Plan provides, in pertinent part: "Exterior [window] sills are of stone."  However, in breach of the Plan, the exterior window sills are not made of stone but, instead, are made of Exterior Insulation and Finishing System ("EIFS") which is a vastly inferior product;

(e) Page 97 of the Plan provides, in pertinent part that: "Roof parapets shall be a minimum of 3'-6" above the roof and shall be constructed of steel stud and Viroc sheathing finished with two (2) layers of stucco cement. The parapet copings are constructed of the same materials."  However, in breach of the Plan, the parapet copings were constructed, in part, with wood, the Building does not contain the requisite parapets on the roof and the parapets that are present are constructed with materials other than those specified in the Plan;

(f) Page 101 of the Plan provides, in pertinent part that: "Apartment kitchenettes shall be mechanically ventilated as required by applicable codes. The bathrooms and or powder rooms shall be mechanically ventilated where natural ventilation is not provided."  However, in breach of the Plan, the kitchenettes and bathrooms in the Units are not mechanically ventilated as required by the applicable codes in accordance with the Plan;

(g) in violation of the applicable codes and the filed plans and specifications, the Units are not equipped with fire dampers and/or the fire dampers were installed in the wrong locations;

(h) The filed plans and specifications required the cornices of the Building to be removed.  However, in contravention of the filed plans and specifications, the cornices were never removed from the Building and, in violation of the applicable codes, the cornices of the Building are deteriorating and unsafe;

(i) in violation of the applicable codes, the common dryer vent for the laundry room is not of sufficient size to allow all of the dryers to operate and it discharges within 10 feet of an operable window;

(j) in violation of the applicable codes, Sponsor failed to outfit the Building with requisite emergency lights and signs;

(k) in violation of the applicable codes, the Building contains inadequate fire stopping and lacks requisite fire rated doors.

Case 1:25-cv-08593    Document 1-1    Filed 10/17/25    Page 11 of 22

(l) in violation of the applicable codes, water infiltrates the Building electrical room; and

(m) Page 86 of the Plan states, provides in pertinent part that: "Sponsor adopts the Description of Property and Building Condition set forth in Part II of the Plan and represents that it has no knowledge of any material defects or need for major repairs to the Building except as set forth in the Description of Property and Building Condition or as contemplated to be made as described herein." However, in breach of the Plan, Sponsor was fully aware of the material defects and the need for major repairs in the Building as described herein at the time the Plan was prepared and accepted for filing.

46.    As a result of the foregoing, Plaintiff has suffered actual damages in an amount no less than Thirty Million Dollars ($30,000,000.00).

**F. SPONSOR'S FAILURE TO PROVIDE THE BOARD WITH AS-BUILT PLANS**

47.    Page 47 of the Plan provides, in pertinent part: "The Sponsor agrees to have a set of 'as-built' plans delivered to the Board."

48.    However, in breach of the Plan, Sponsor failed to deliver a full set of "As-Built" Plans for the Building to the Board.

**G. SPONSOR'S FAILURE TO DELIVER WARRANTIES TO THE BOARD**

49.    Page 50 of the Plan provides, in pertinent part that:

"Any warranties in Sponsor's possession as of the First Closing that relate to the Common Elements will be assigned to the Board of Managers at the First Closing."

50.    Page 97 of the Plan provides, in pertinent part that:

"All roof membranes and flashing shall be in accordance with job specifications and a 10 year guarantee shall be received from both Firestone and the roofing company."

51.    However, in breach of the Plan, Sponsor failed to deliver any warranties or guarantees (the "Warranties") in its possession relating to the common elements and/or the roof membrane and flashing of the Building to the Board at the First Closing in accordance with the

Case 1:25-cv-08593    Document 1-1    Filed 10/17/25    Page 12 of 22

Plan.

52.    Even now, almost ten (10) years after the First Closing, Sponsor, has failed to deliver any of the Warranties to the Board.

## H. **BRAD'S BREACHES OF HIS FIDUCIARY DUTY TO THE BOARD**

53.    Brad, as a member of the Board from 2008 to September, 2012, Brad owed a fiduciary duty to the Board and the Condominium Unit Owners to act in the best interest of the Board and the Condominium Unit Owners.

54.    While owing a fiduciary duty to the Board and the Condominium Unit Owners as a member of the Board, Brad was in the unique position of also, simultaneously, controlling the Sponsor and Thurcon.

55.    In breach of his fiduciary duty, Brad did not, at any time during his tenure as a member of the Board, inform the Board that the Sponsor had failed to construct the Building in accordance with the Plan, applicable codes and filed plans and specifications, even though he was fully aware of same.

56.    In breach of his fiduciary duty Brad actively concealed the existence of dangerous life/safety issues in the Building from his fellow Board members.

57.    In breach of his fiduciary duty Brad, as a member of the Board, repeatedly and consistently lied to his fellow Board members about the status of the PCO.

58.    In breach of his fiduciary duty, Brad repeatedly informed the Board that the issuance of the PCO was imminent and that Sponsor was only waiting for the sign-offs on the sprinkler system and fire alarm system when, in actuality, Brad was fully aware that the Sponsor was nowhere close to obtaining a PCO for the Building.

59.    In breach of his fiduciary duty, Brad failed to inform the Sponsor that the Sponsor

Case 1:25-cv-08593    Document 1-1    Filed 10/17/25    Page 13 of 22

had failed to construct the Building in accordance with the Plan, applicable codes, filed plans and specifications, even though he was fully aware of same.

60.     In breach of his fiduciary duty, Brad either permitted, or caused, Sponsor to transfer funds thereby rendering Sponsor insolvent and/or judgment proof.

61.     In breach of his fiduciary duty, Brad either permitted, or caused, Sponsor to transfer the Myrentco Units to Myrentco for no consideration, thereby rendering Sponsor insolvent and/or judgment proof.

62.     In breach of his fiduciary duty, Brad failed to cause Sponsor to remedy the myriad breaches of the Plan.

63.     In breach of his fiduciary duty, Brad failed to cause Sponsor and/or Thurcon to remedy conditions in the Building of which he was aware.

64.     In breach of his fiduciary duty, Brad failed to cause Sponsor to correct numerous misrepresentations in the Plan.

## I. FRAUD COMMITTED BY SPONSOR, BRAD AND HAROLD

65.     Sponsor, Brad and Harold made numerous false statements of material fact (the "False Construction Statements") in the Plan regarding the construction of the Building.

66.      Sponsor and Brad made numerous false statements of material fact to the Board with respect to the status of the PCO (the "False PCO Statements").

67.     Prior to the issuance of the first TCO for the Building, Sponsor, Brad and Harold were aware that the exhaust system in the Building and the exhaust vents in the Units (collectively the "Exhaust System") were not functioning properly.

68.     The DOB required that the Exhaust System pass inspection before it would issue the initial TCO for the Building.

69.     Sponsor would not have been able to commence selling the Units until it obtained the initial TCO for the Building.

70.     Upon information and belief, Sponsor, Brad and Harold directed Sponsor's and/or Thurcon's employees to close all of the exhaust vents in every Unit of the Building so that the Exhaust System would pass the DOB inspection.

71.     The Exhaust System passed the DOB inspection, even though it was not operating properly, solely as a result of all of the exhaust vents in every Unit of the Building being closed.

### AS AND FOR A FIRST CAUSE OF
### ACTION AGAINST SPONSOR
#### (Breach of Contract)

72.     Plaintiff repeats and realleges paragraphs 1 through 71 as if more fully set forth herein.

73.     The Plan is a valid and binding contract.

74.     Each Unit Owner of the Condominium who purchased a unit from the Sponsor entered into a form written agreement with the Sponsor, as seller, for such purchase (the "Purchase Agreement").

75.     The Purchase Agreement expressly provides that the Plan is incorporated into the Purchase Agreement and, further, that in the event of any inconsistency between the provisions of the Purchase Agreement and the Plan, the provisions of the Plan control.

76.     Page 8 of the Plan provides, in pertinent part, that:

> "The Sponsor's obligation regardless of any limitations contained in the Plan cannot go below the duty to construct the Premises in accordance with all applicable codes and filed plans and specifications.";

77.     Plan, at page 47, states, in pertinent part, that:

> "The issuance of a final Certificate of Occupancy for the Building shall be deemed presumptive evidence that the Building, its

Case 1:25-cv-08593 Document 1-1 Filed 10/17/25 Page 15 of 22

appurtenances and all the Units have been substantially completed in accordance with the Plan and the "plans." However, nothing herein contained shall excuse Sponsor from any of its obligations under this Plan or in law"; and

78. Page 52 of the Plan provides, in pertinent part that:

"The Sponsor is obligated to obtain a permanent Certificate of Occupancy. The Sponsor's obligation, regardless of any limitations in the warranty, cannot go below the duty to construct the Premises in accordance with all applicable codes and filed plans and specifications. Any conflict between the disclaimers and the Sponsor's obligation to construct the Premises in accordance with all applicable codes and filed plans and specifications shall be resolved in favor of the latter."

79. As described in the above paragraphs including, but not limited to, paragraph 45, Sponsor breached its obligations under the terms of the Plan including, without limitation, that Sponsor would construct the Building in accordance with the terms of the Plan and with the plans and specifications filed with the DOB and in accordance with the applicable codes.

80. As described in paragraphs 18-27 above, Sponsor breached the Plan by failing to obtain a PCO for the Building within two (2) years after the First Closing.

81. As described in paragraphs 18-27 above, Sponsor breached the Plan by allowing the TCO to lapse at least twenty-four (24) times and for using a TCO for the Building for longer than two (2) years.

82. As described in paragraphs 47-52 above, Sponsor breached the Plan by failing to provide as-built plans and/or Warranties to the Plaintiff.

83. Plaintiff performed all of its obligations in accordance with the Plan and the Units Owners and Plaintiff performed all obligations of the Purchase Agreements that they were required to perform.

84. By reason of Sponsor's breaches, Plaintiff has been damaged in an amount to be determined at the time of trial, but believed to be in excess of Thirty Million Dollars

($30,000,000.00) , along with costs and interest from July 1, 2008.

## AS AND FOR A SECOND CAUSE OF ACTION AGAINST BRAD
### (Breach of Fiduciary Duty)

85.     Plaintiff repeats and realleges paragraphs 1 through 84 as if more fully set forth herein.

86.     Brad served as a Sponsor-appointed member of the Board from 2008 to September, 2012.

87.     Brad owed a fiduciary duty to the Board and the Condominium Unit owners to act in the best interests of the Board and the Condominium Unit owners.

88.     Brad was prohibited from engaging in self-dealing by causing himself to benefit at the expense of the Board or the Condominium Unit owners.

89.     Brad breached his fiduciary duty to the Board and the Condominium Unit owners as more fully described in paragraphs 53-64 above by: (a) failing to inform the Board that the Sponsor had failed to construct the Building in accordance with the Plan, applicable codes and filed plans and specifications; (b) actively concealing the existence of dangerous life/safety issues in the Building from his fellow Board members; (c) repeatedly and consistently lying to his fellow Board members about the status of the PCO; (d) failing to inform the Sponsor, in writing, that the Sponsor had failed to construct the Building in accordance with the Plan, applicable codes, filed plans and specifications; (e) permitting, or causing, Sponsor to transfer funds thereby rendering Sponsor insolvent and/or judgment proof; (f) permitting, or causing, Sponsor to transfer the Myrentco Units to Myrentco for no consideration, thereby rendering Sponsor insolvent and/or judgment proof; (g) failing to cause Sponsor to remedy the myriad breaches of the Plan; (h) failing to cause Sponsor and/or Thurcon to remedy conditions in the Building of which he was aware; and failing to cause Sponsor to correct numerous misrepresentations in the Plan.

90.     As a result of Brad's breach of his fiduciary duty, Plaintiff has been damaged in an amount to be determined at the time of trial, but believed to be in excess of Thirty Million Dollars ($30,000,000.00) for compensatory damages along with costs and interest from July 1, 2008.

## AS AND FOR A THIRD CAUSE OF ACTION
## AGAINST SPONSOR, BRAD AND HAROLD
### (Actual Fraudulent Conveyance)

91.     Plaintiff repeats and re-alleges paragraphs 1 through 90 as if more fully set forth herein.

92.     Upon information and belief, Sponsor's conveyance of the Myrentco Units to Myrentco, and the subsequent sale of the remaining three Unsold Units to outside purchasers, left Sponsor insolvent in that the present salable value of its assets is less than the amount that will be required to pay its probable liability on its obligations to Plaintiff.

93.     Upon information and belief, Sponsor's transfer of the Proceeds from the sale of the Units, as set forth in paragraphs 36-43 above, left Sponsor insolvent in that the present salable value of its assets is less than the amount that will be required to pay its probable liability on its obligations to Plaintiff.

94.     Upon information and belief, Sponsor intended to hinder, delay or defraud Plaintiff by virtue of the transfer of the Myrentco Units to Myrentco and the transfer of the Proceeds.

95.     Upon information and belief, Brad actively participated in the fraudulent transfer of the Myrentco Units to Myrentco and the transfer of the Proceeds.

96.     Upon information and belief, Harold actively participated in the fraudulent transfer of the Myrentco Units to Myrentco and the fraudulent transfer of the Proceeds.

97.     Upon information and belief, Brad was a beneficiary of the fraudulent transfer of the Myrentco Units to Myrentco and the fraudulent transfer of the Proceeds.

Case 1:25-cv-08593    Document 1-1    Filed 10/17/25    Page 18 of 22

98.    Upon information and belief, Harold was a beneficiary of the fraudulent transfer of the units to Myrentco and the fraudulent transfer of Proceeds.

99.    Plaintiff has been damaged as a result of the fraudulent conveyances in an amount to be proven at the time of trial, but believed to be in excess of Thirty Million Dollars ($30,000,000.00) for compensatory damages along with costs and interest from July 1, 2012, plus attorneys' fees for the prosecution of this action.

### AS AND FOR A FOURTH CAUSE OF ACTION
### AGAINST SPONSOR, BRAD AND HAROLD
#### (Constructive Fraudulent Conveyance)

100.    Plaintiff repeats and re-alleges paragraphs 1 through 99 as if more fully set forth herein.

101.    Sponsor transferred the Myrentco Units to Myrentco for no consideration.

102.    Upon information and belief, Sponsor's conveyance of the Myrentco Units to Myrentco, and the subsequent sale of the remaining three Unsold Units to outside purchasers, left Sponsor insolvent in that the present salable value of its assets is less than the amount that will be required to pay its probable liability on its obligations to Plaintiff.

103.    Myrentco was aware of Sponsor's poor financial condition at the time the units were transferred to Myrentco.

104.    Upon information and belief, Sponsor's transfer of the Proceeds, as set forth in paragraphs 36-43 above, left Sponsor insolvent in that the present salable value of its assets is less than the amount that will be required to pay its probable liability on its obligations to Plaintiff.

105.    Upon information and belief, Sponsor did not continue solvency after the transfer of the Myrentco Units to Myrentco.

106.    Upon information and belief, Sponsor did not continue solvency after the transfer

Case 1:25-cv-08593    Document 1-1    Filed 10/17/25    Page 19 of 22

of the Proceeds.

107.    Sponsor was engaged in a business or transaction for which the property remaining in its hands after the conveyance was an unreasonably small capital.

108.    Upon information and belief, Brad actively participated in the fraudulent transfer of the Myrentco Units to Myrentco and the transfer of the Proceeds.

109.    Upon information and belief, Harold actively participated in the fraudulent transfer of the Myrentco Units to Myrentco and the fraudulent transfer of the Proceeds.

110.    Upon information and belief, Brad was a beneficiary of the fraudulent transfer of the Myrentco Units to Myrentco and the fraudulent transfer of the Proceeds.

111.    Upon information and belief, Harold was a beneficiary of the fraudulent transfer of the Myrentco Units to Myrentco and the fraudulent transfer of Proceeds.

112.    Plaintiff has been damaged as a result of the fraudulent conveyances in an amount to be proven at the time of trial, but believed to be in excess of Thirty Million Dollars ($30,000,000.00) for compensatory damages along with costs and interest from July 1, 2012, plus attorneys' fees for the prosecution of this action.

### AS AND FOR A FIFTH CAUSE OF
### ACTION AGAINST MYRENTCO
### (Successor Liability)

113.    Plaintiff repeats and re-alleges paragraphs 1 through 112 as if more fully set forth herein.

114.    The Plan, at page 56, states that:

"Thereafter, for so long as the Sponsor owns one or more unsold Residential Units, Sponsor or its designee shall have the right to elect one (1) Residential member of the Board.  After the end of the control period, Sponsor may, just as any other Unit Owner, cast its votes for Unit Owners of its choice."

18

Case 1:25-cv-08593    Document 1-1    Filed 10/17/25    Page 20 of 22

115.    Sponsor sold the Units in its name in 2012, but its affiliate, Myrentco, continues to hold the six (6) units that it received from Sponsor for no consideration.

116.    As the testimony at the first trial unequivocally established, Myrentco has elected a residential member to the Board every year since 2012, which Myrentco would have no right to do unless it was a successor to the Sponsor.

117.    Sponsor has expressly admitted that the transfer of the Myrentco Units by Sponsor to Myrentco: (a) was for no consideration; (b) "was a mere change of identity of form of ownership"; and (c) "did not change the beneficial ownership of the transferred condo units".

118.    Sponsor also expressly admitted that the transfer of Myrentco Units by Sponsor to Myrentco was "disclosed in public documents at the time of the transfer that the transferor and transferee were related parties."

119.    Pursuant to the Plan, only Sponsor may lease its units without first affording the Board the right of first refusal to lease the unit on the same proposed terms and conditions.

120.    As successor to the Sponsor, Myrentco has leased its units without any authorization from the Board and without providing the Board with an opportunity to exercise its right of first refusal.

121.    During the first trial of this action, which resulted in a mistrial, Defendants' counsel made it clear in his opening statement that, by virtue of Myrentco's ownership of units in the Building, Sponsor currently pays a portion of the fees incurred by Plaintiff relating to this litigation.

122.    The statistical information downloaded from the official database maintained by the Attorney General's Real Estate Finance Bureau conclusively identifies Myrentco as the "Sponsor" of the Building.

Case 1:25-cv-08593    Document 1-1    Filed 10/17/25    Page 21 of 22

123.     Based on the foregoing, Myrentco is liable to Plaintiff as the successor of Sponsor for all damages sustained by Plaintiff as a result of Sponsor's acts and omissions as described above in an amount to be proven at the time of trial, but believed to be in excess of Thirty Million Dollars ($30,000,000.00) for compensatory damages along with costs and interest from July 1, 2012, plus attorneys' fees for the prosecution of this action.

**WHEREFORE,** Plaintiff demands judgment:

A.     On its First Cause of Action against Sponsor, in an amount to be proven at the time of trial, but believed to be in excess of Thirty Million Dollars ($30,000,000.00), along with costs and interest from July 1, 2008;

B.     On its Second Cause of Action against Brad in an amount to be proven at the time of trial, but believed to be in excess of Thirty Million Dollars ($30,000,000.00) for compensatory damages along with costs and interest from July 1, 2012;

C.     On its Third Cause of Action against Sponsor, Brad and Harold, jointly and severally, in an amount to be proven at the time of trial, but believed to be in excess of Thirty Million Dollars ($30,000,000.00) for compensatory damages along with costs and interest from July 1, 2012, plus attorneys' fees for the prosecution of this action;

D.     On its Fourth Cause of Action against Sponsor, Brad and Harold, jointly and severally, in an amount to be proven at the time of trial, but believed to be in excess of Thirty Million Dollars ($30,000,000.00) for compensatory damages along with costs and interest from July 1, 2012, plus attorneys' fees for the prosecution of this action;

E.     On its Fifth Cause of Action against Myrentco in an amount to be proven at the time of trial, but believed to be in excess of Thirty Million Dollars ($30,000,000.00) for compensatory damages along with costs and interest from July 1, 2012, plus attorneys' fees for

the prosecution of this action; and

F.       Such other and further relief in favor of Plaintiff as this Court deems just, proper

and equitable.

Dated: New York, New York
       January 20, 2022

                              **RIVKIN RADLER LLP**
                              Attorneys for Plaintiff

                              By:    *Evan R. Schieber*
                                        Evan R. Schieber
                              477 Madison Ave. - Suite 410
                              New York, New York 10022
                              (212) 455-9555

3889416.v3